

U.S. Department of Justice

United States Attorney
Eastern District of New York

NS:JRS/NJM
F. #2019R00984

271 Cadman Plaza East
Brooklyn, New York 11201

October 21, 2020

By ECF

The Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Tyquan Jackson
                Criminal Docket No. 19-356 (ARR)

Dear Judge Ross:

      The government respectfully submits this letter to request that the defendant's bail be revoked. In preparing for trial, which is currently scheduled for December 7, 2020, the government has learned new facts that warrant a reopening of the Court's prior bail determination pursuant to 18 U.S.C. § 3142(f). Most importantly, the government has learned that the defendant misled the Court by falsely claiming to have asthma, which largely formed the basis of the Court's decision to grant his release in the first place.

      In light of that dishonesty, as well as additional facts the government has learned further showing the defendant's dangerousness, the defendant cannot be trusted to abide by the terms of his release and should be detained.

I.      Background[1]

      A.    The Current Charges

      The defendant is charged with one count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). As set forth in the Complaint (ECF Dkt. No. 1), the defendant was caught carrying a loaded semi-automatic

---

[1] Much of the facts and arguments below were set forth in the government's oppositions to the defendant's first and second motions for bail. See ECF Dkt. Nos. 30, 48. The government repeats these facts and arguments here for the convenience of the Court.

handgun in Brooklyn on the night of July 6, 2019.  When approached by police officers, the defendant ran away, with the police chasing him by car and then by foot.  While running, the defendant threw the loaded firearm into a private driveway before he was finally apprehended.

### B. The Defendant's Past Conduct

This charge is only the most recent of the defendant's long string of criminal activity, most of which has been committed while on bail for other offenses.

In June 2012, the defendant was arrested for criminal possession of a controlled substance.  He pleaded guilty in September 2012 and was released pending sentencing.  One month later, in October 2012, he was arrested again, for criminal sale of a controlled substance.  He pleaded guilty to this offense in November 2012 and was once again released on bail pending sentencing.  While out on bail for these two offenses, the defendant failed to appear at least twice and appeared only after the issuance of bench warrants.

In January 2015, while on bail for the two above-described convictions, the defendant committed yet another drug crime, criminal sale of a controlled substance.  The defendant was not immediately arrested for this offense, but in May 2015, the defendant was caught carrying a loaded firearm and crack cocaine.  This time, the state court remanded him without bail.

The defendant ultimately pleaded guilty to the January and May 2015 offenses in 2016 and was sentenced for all of the above offenses that same year.

The defendant was released on parole in May 2018.  Less than a year later, in December 2018, the defendant committed several larceny offenses, for which he was arrested in February 2019.  The defendant was released on bail.[2]

On July 6, 2019, while on both bail and parole, the defendant was caught with the loaded semi-automatic handgun that underlies his current charges.

### C. Procedural History

#### 1. The Defendant's First Bail Revocation

The defendant was arrested on federal charges on July 24, 2019 and appeared for a detention hearing before the Honorable Peggy Kuo that same day.  Judge Kuo ordered the defendant released on a $50,000 bond secured by four sureties — the defendant's mother,

---

[2] The defendant subsequently admitted to this conduct as part of his parole violation proceedings.

sister, brother and girlfriend. ECF Dkt. No. 5. Judge Kuo also ordered that the defendant be subject to home detention and location monitoring. Id.

One day after the defendant was released on federal bail, he was re-arrested by state authorities to be held for his parole violation proceedings.

While in state custody, the defendant refused to appear for federal court appearances on at least three occasions, in violation of the terms of his federal bail.[3] On November 13, 2019, the Court revoked his bail and made clear on the record that the Court would issue a force order if the defendant failed to appear again. See ECF Dkt. No. 23. The defendant moved to be rereleased on bail on December 9, 2019 (ECF Dkt. No. 29 ("Def. 1st Mot.")), but the Court denied the motion on December 10, 2019, finding the defendant to be both a flight risk and a danger to the community (ECF Dkt. No. 32).

### 2. The Defendant's Release

On April 15, 2020, the defendant again moved for bail, arguing primarily that release was appropriate in light of the risks posed to him from COVID-19. See ECF Dkt. No. 47 ("Def. 2d Mot."). The defendant claimed that he was "particularly at risk for grave health complications should he contract COVID-19" because he was "asthmatic." Id. at 1.

The government responded the following day, arguing that the defendant's prior conduct demonstrated that he was a risk of flight and a danger to the community. See ECF Dkt. No. 48 at 4-6. The government further argued that the MDC had taken appropriate steps to protect inmates from the spread of COVID-19 and that release was not otherwise warranted. See id. at 6-11.

On April 17, 2020, the Court granted the defendant's motion. See United States v. Jackson, No. 19-CR-356 (ARR), 2020 WL 1905674 (E.D.N.Y. Apr. 17, 2020). The Court relied heavily on the defendant's representation that he suffered from asthma, holding that "[t]he COVID-19 crisis — and the heightened risk that it poses to Jackson as an asthma sufferer detained in a facility where the virus is present — is new information that has material bearing on whether any conditions of release will reasonably assure Jackson's appearance and the safety of the public." Jackson, 2020 WL 1905674, at *2. The Court continued, "Jackson's incentive to stay at home to avoid contracting COVID-19 and developing complications, will reasonably assure his appearance and the public safety." Id.

---

[3] The defendant has previously claimed that he never "knowingly and intentionally" refused to come to court and blames his failures to appear on the United States Marshal Service. The government has spoken to officials of the Marshal Service regarding this case and those officials have consistently stated that the defendant refused to come to court on numerous occasions.

3

II.        <u>Legal Standard</u>

[A] bail hearing 'may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.'" <u>Jackson</u>, 2020 WL 1905674, at *2 (quoting 18 U.S.C. § 3142(f)).

III.       <u>Discussion</u>

        A.        <u>The Defendant Misled the Court</u>

On April 13, 2020, two days before he filed his second motion for bail, the defendant had a recorded jail call with his girlfriend, who subsequently became one of his bond sureties. On this call (included herewith as Exhibit A), the defendant and his girlfriend discussed his planned motion and potential arguments:

**Defendant:** So my mom saying, what my lawyer talking about?

**Girlfriend:** I don't know, she said she spoke to basically your family, I don't know, somebody in your family, they supposed to be like a judge or something, I don't know. And she said basically, they told her to go talk to the lawyer and like oh yeah, she's sick and she don't know how much time she's got, some shit like that. I don't know if she was serious or I don't know.

**Defendant:** No, she's talking about my uncle, my uncle. Isabella's, Isabella's mother, that's my uncle's baby mother.

**Girlfriend:** I'm not even taking about that, I'm talking her and her health.

**Defendant:** I know, she is, she is sick babe. Babe. Like, you gotta like . . . sometimes, like I dunno, I can't explain it. You gotta finesse . . . .

**Girlfriend:** No, I didn't know she was . . . alright forget it.

**Defendant:** Because this phone.[4]

**Girlfriend:** As long as it's a finesse, the fuck.

---

    [4] The defendant is well aware that jail calls are recorded and frequently begins his calls with the admonition, "No hot shit on this phone."

4

**Defendant:** She should be good, I mean, I hope she good, I hope that's not . . . I mean, she did say she have um, blood clots in her arteries, and stuff like that, but . . . .

**Girlfriend:** No, I know that.

**Defendant:** I just hope that whatever they gotta do to get me home, is like that's what they gotta . . . I just wanna get home, like . . . .

**Girlfriend:** And when I get off the phone with you, I'mma call him too. Because I had spoke to him and he asked me like, oh, do you have any um, like, any health problems that will put you at high risk that parole know. Your mother told me like that when you was a baby, you had bronchitis, and whatever, so I told him that. And he was like he was gonna call me. He hasn't called yet, so I'm gonna call him as soon as I get off this phone.

**Defendant:** I got asthma too. I just, just got my asthma pump and all that.

**Girlfriend:** [Long pause] When you got asthma? In there?

**Defendant:** I been had asthma. I just never had . . . I just never did no running or nothing like that before. I, I never carried my pump.

**Girlfriend:** [Laughing]

**Defendant:** Babe sometimes you just like, like you just slow sometimes, babe.

**Girlfriend:** [More laughing]

**Defendant:** Babe, you just slow babe.

**Girlfriend:** [More laughing] You aint never need no pump, no pump when you try to fight me. [Harder laughing][5]

**Defendant:** Yo babe you're slow babe.

**Girlfriend:** [More hard laughing]

**Defendant:** Like, like a nigga, a nigga could be like, you like . . . at least let me . . . even if I, if I didn't have asthma, like damn my nigga, like . . .

---

[5] The defendant's calls with his girlfriend include numerous threats of domestic violence.

5

>**Girlfriend:**   [Laughing]
>
>**Defendant:**   . . . let the world know I was lying.  Like, fuck.  Yo fuck, babe we not on a . . . babe, we on a jail phone.
>
>**Girlfriend:**   Alright, I miss you.

Ex. A at 1:25 to 4:00.

The defendant's girlfriend's surprise at his claimed asthma is understandable. As reflected in the body-worn camera footage in this case, the defendant led the police on a prolonged foot chase without any respiratory distress.  Moreover, in his Pretrial Services interview, the defendant stated that he was "in excellent physical health with no medical problems reported."  Pretrial Services Report at 2.

The defendant's medical records, included herewith as Exhibits B and C, similarly indicate that the defendant did not, in fact, have asthma.[6]  Most glaringly, on July 8, 2019, following his state arrest in this case, the defendant filled out a screening form for his admission to a New York City jail.  In this screening form, in response to the question, "Do you have asthma?", the defendant wrote, "[N]o."  Ex. B at TJ004021.

In an August 15, 2019, health screen at the MDC, the defendant denied any respiratory issues and listed "insomnia" as his only current medical condition.  Id. at TJ003980-TJ003984.  The defendant did not list any asthma medication among his medications.  See id.  In a November 26, 2019, health screen, the defendant again denied any respiratory issues, denied any current medical conditions and listed no medications.  See id. at TJ003968-TJ003972.

At his December 6, 2019 physical, the defendant once more denied any respiratory issues, listed no current physical medical conditions, and listed no asthma medication among his medications.  See id. at TJ003986-TJ003999.  During this physical, the defendant's lung function was checked, and no issues were noted.  See TJ003996.  The defendant disclosed, however, that he was a pack-a-day smoker and had been for the past three years.  See id. at TJ003992.

The defendant received an injury assessment on March 4, 2020, after he participated in a group assault within the jail (discussed below).  See Ex. C at TJ004040-

---

[6] Because Exhibits B and C contain health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the government respectfully requests that they be filed under seal.  See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common-law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).

6

TJ004042. No lung or breathing issues were noted. See id. Following the assault by the defendant, he was sent to the Special Housing Unit (the "SHU").

While the defendant was in the SHU, the COVID-19 crisis began and the MDC began to implement procedures to limit the spread of COVID-19, including banning visits and limiting inmate movements. After these procedures went into place, on March 20, 2020, the defendant apparently requested and received a prescription for an albuterol inhaler. See id. at TJ004038. The only explanation given on the prescription documentation was, "I have reviewed this patient's medical intake and renewing current medications for continuity of care." Id. According to counsel for the MDC, this likely indicates that the defendant self-reported that he required an albuterol inhaler, as asthma testing at the MDC is ordinarily limited to determining the proper course of treatment for inmates for whom albuterol alone is insufficient. Counsel for the MDC stated that it was unlikely that a non-emergency asthma assessment could have been undertaken in March 2020 given the limitations imposed by COVID-19 at that time. As discussed above, the defendant's medical records indicate that, prior to the COVID-19 pandemic, he had denied having asthma and had not been prescribed any asthma medication.[7]

The fact that the defendant does not really have asthma undermines the basis for the Court's decision to reverse its prior determination that the defendant was a risk of flight and a danger to the community. As the Court stated, it "had denied his previous request for bail" because the defendant "does not have a good track record of complying with conditions of bail and appearing in court as required[, and] [h]e does have a significant criminal history and has missed court appearances." Jackson, 2020 WL 1905674, at *3. But the Court reasoned that this time would be different because "Jackson has a strong incentive to stay at home and maintain social isolation: just going outside would put him at risk for a deadly disease." Id. That reasoning, through no fault of the Court's, was based on a lie.

More fundamentally, the defendant's calculated dishonesty to the Court and to his own counsel demonstrates that he cannot be trusted to remain on bond. Especially with trial approaching, the risk of conviction and a serious term of imprisonment will loom ever larger in the defendant's mind. A defendant who is willing to lie about basic facts and to exploit a health crisis for his own benefit cannot be trusted to resist the temptation to flee and cannot be trusted to not commit further crimes.

      B.     Additional Criminal Conduct by the Defendant

In preparing for trial, the government has learned several new facts about the defendant that further demonstrate his dangerousness.

---

[7] The defendant was also not included on the MDC's list of inmates suffering from conditions rendering them at high risk for COVID-19, which included inmates with asthma diagnoses.

First, on March 2, 2020, approximately a month before moving for bail, the defendant was captured on surveillance video participating in a group assault in the MDC. Specifically, the defendant and another inmate went into another inmate's cell and began to punch and kick him. The defendant was placed in the SHU following this incident, but he was released on bail before a disciplinary hearing could be held.

Second, as set forth above, in May 2015, the defendant was arrested carrying a loaded firearm. When the defendant was arrested, another occupant in the same vehicle was also found to be in possession of a loaded firearm and was arrested. Ballistics analysis of both of the firearms seized that day subsequently matched both of those firearms to other crimes. The firearm seized from the other individual was linked to a shots-fired incident with no injuries. The firearm seized from the defendant was linked to a non-fatal shooting during which an individual was shot repeatedly in the neck and torso. Because the complaint for the non-fatal shooting is sealed, it is unclear whether, or to what extent, the defendant was involved in that shooting.

Third, the government has learned that the defendant has previously admitted that he is a member of the Bloods street gang. Specifically, during a previous term of incarceration at the Rikers Island jail, the defendant identified himself as a member of the Bloods to prison authorities so that he could be housed with other Bloods members and protected from rival gangs. The government has also learned that the defendant previously conspired with other members of the Bloods to smuggle drugs into jail and prison. In particular, on July 9, 2016, while the defendant was held at Rikers Island jail, the defendant had two recorded calls with an individual whose identity is known to the government ("Individual-1") about smuggling thousands of dollars' worth of suboxone strips (referred to on the call by their street name of "chinitas") to the defendant in the jail. During those two calls, Individual-1 conferenced in another Rikers inmate who identity is known to the government ("Individual-2"), who was also a self-identified member of the Bloods.[8] The defendant was subsequently caught and disciplined for drug possession and smuggling while in state prison.

These new facts merely emphasize what the previously known facts about the defendant already showed. From 2012 to the present, the defendant has been engaged in an unceasing pattern of serious criminal conduct. Even when on bail, even when on parole, and even while incarcerated, the defendant is unwilling or unable to abide by the law's basic requirements. Based on that history, the defendant continues to pose an unacceptable danger

---

[8] Based on Rikers Island records, Individual-1 visited five self-identified members of the Bloods on Rikers Island from 2015 to 2018 (including the defendant and Individual-2) and visited only two individuals who had not self-identified as Bloods, which suggests that Individual-1 was himself a member or associate of the Bloods gang. During one of his visits to Individual-2, a canine alerted to Individual-1 and he was turned away from the facility after he refused to be searched.

to the community and his temporary release due to his purported asthma and COVID-19 should be terminated.

IV.     Conclusion

For the reasons set forth above, the government respectfully requests that the Court revoke the defendant's bail.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:     /s/
Jonathan Siegel
Nicholas Moscow
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (ARR) (by ECF)
       James L. Koenig, Esq. (by ECF and Email)
       U.S. Pretrial Services Officer Ramel Moore (by Email)