UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

— against —

TYQUAN JACKSON,

Defendant.

**No. 19-CR-356 (ARR)**

**Not for print or electronic publication**

**Opinion & Order**

ROSS, United States District Judge:

Defendant moves for an order permitting the defense to cross-examine the government's witnesses regarding the negative credibility findings—and the facts underlying those findings—contained in the *Giglio* material provided by the government. Def.'s Mot. 9, ECF No. 78. In contrast, the government moves to preclude defendant from cross-examining its witnesses about any of the credibility findings in its *Giglio* material. Gov't's Mot. 1, ECF No. 76. The government also moves to cross-examine Mr. Jackson, in the event that he testifies, about his efforts to mislead me about his having asthma in order to avoid imprisonment. Gov't's Letter 1, ECF No. 99.

For the reasons discussed below, I order that defendant is precluded from cross-examining the government witnesses regarding the Internal Affairs Bureau ("IAB") investigations and the civil lawsuits summarized by the government. Defendant is also precluded from cross-examining the witnesses about the Civilian Complaint Review Board ("CCRB") cases, with the exception of the 2015 findings against Sergeant Alexander, *id.* at 5; the October 2018 findings against Officers Cayenne and Sabella, *id.* at 8–9, 13; and the August 2011 finding

1

against Officer Feliciano, *id.* at 11–12. I also order that defendant is permitted to cross-examine

Sergeant Alexander about Judge Irizarry's adverse credibility finding in *United States v. Kelvin*

*Jones*, No. 17-CR-103 (DLI), 2018 WL 1582217 (E.D.N.Y., Mar. 29, 2018). *See* Gov't's Mot.

2–3. Finally, I order that if Mr. Jackson testifies at trial, the government is permitted to cross-

examine him about misleading me about having asthma. Limitations on the scope of the cross-

examination and redirect examination are discussed below.

## LEGAL STANDARD

Federal Rule of Evidence 608(b) permits the court to allow specific instances of a

witness's conduct to be inquired into on cross-examination "if they are probative of the character

for truthfulness or untruthfulness of . . . the witness." The district court has "discretion to permit

or deny a line of inquiry on cross-examination." *United States v. Cruz*, 894 F.2d 41, 43 (2d Cir.

1990) (citing *United States v. Pedroza*, 750 F.2d 187, 195 (2d Cir. 1984), *cert. denied*, 479 U.S.

842 (1986)); *see also United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) ("It is settled

that '[t]he scope and extent of cross-examination lies within the discretion of the trial judge.'"

(quoting *United States v. Blanco*, 861 F.2d 773, 781 (2d Cir. 1988), *cert. denied*, 489 U.S. 1019

(1989))).

The court may preclude cross-examination if the prior conduct is not probative of

truthfulness or if, under Federal Rule of Evidence 403, its "probative value is substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue

delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *United*

*States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002). "While a district court may impose

reasonable limits on cross-examination to protect against, e.g., harassment, prejudice, confusion,

and waste . . . it must also give wide latitude to a defendant in a criminal case to cross-examine

government witnesses." *United States v. Cedeño*, 644 F.3d 79, 82 (2d Cir. 2011) (citations and internal quotation marks omitted). A court's "decision to restrict cross-examination will not be reversed absent an abuse of discretion." *United States v. Lawes*, 292 F.3d 123, 131 (2d Cir. 2002) (quoting *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993)), and "[a] trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (citing *United States v. Singh*, 628 F.2d 758, 763 (2d Cir.), *cert. denied*, 449 U.S. 1034 (1980)).

In analyzing the admissibility of substantiated allegations related to the witness's character for truthfulness, the court should consider the seven factors laid out in *United States v. Cedeño*:

(1) "whether the prior judicial finding addressed the witness's veracity in that specific case or generally";

(2) "whether the two sets of testimony involved similar subject matter";

(3) "whether the lie was under oath in a judicial proceeding or was made in a less formal context";

(4) "whether the lie was about a matter that was significant";

(5) "how much time had elapsed since the lie was told and whether there had been any intervening credibility determination regarding the witness";

(6) "the apparent motive for the lie and whether a similar motive existed in the current proceeding"; and

(7) "whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible."

3

644 F.3d at 82–83. The Second Circuit first formulated the governing test in *United States v. Cruz*, 894 F.2d 41 (2d Cir. 1990), which enunciated only the first two factors. Two years later, in *Cedeño*, the circuit found that in some cases reliance on the two *Cruz* factors alone "could unduly circumscribe . . . a trial court's discretion" and proposed five additional factors for consideration. 644 F.3d at 82–83. These factors are "non-exhaustive," *United States v. White*, 692 F.3d 235, 249 (2d Cir. 2012), and the district court may consider "other factors affecting the probity and relevancy of a prior court's finding that a witness had lied," *Cedeño*, 644 F.3d at 83.

## DISCUSSION

### I.      Lawsuits and IAB Cases

As I explained in my November 9, 2020 order, ECF No. 89, the IAB cases[1] and lawsuits summarized by the government do not contain any findings related to the credibility of the officers. Therefore, defendant is precluded from raising this material in its cross-examination of the witnesses.

### II.      CCRB Cases

With the exception of the three cases highlighted below, the CCRB cases[2] summarized by the government do not pertain to the officers' characters for untruthfulness. I have reviewed the underlying files related to the August 2011, April 2015, and October 2018 CCRB investigations and find that the defendant is entitled to cross-examine the witnesses regarding the credibility findings therein. As discussed below, the scope of this cross-examination must be limited to the credibility findings themselves and may not inquire into the facts of the underlying misconduct.

---

[1] This includes the IAB investigation summarized in the government's additional letter dated October 26, 2020. ECF No. 81.

[2] This includes the two CCRB cases summarized by the government in its additional letters dated November 9, 2020. ECF Nos. 90–91.

A.  The October 2018 Case Against Officers Cayenne and Sabella

The CCRB substantiated allegations that Officers Cayenne and Sabella attempted to

make an improper stop of an individual, and that Officer Sabella lacked a basis to use force to

stop that individual. Gov't's Mot. 9, 13. During the CCRB investigations, Officers Cayenne and

Sabella gave wholly contradicting accounts concerning their reasons for suspecting the

individual of a robbery. *Id.* at 9. Furthermore, Officer Cayenne claimed that he was responding

to a 911 call which described the perpetrator of the robbery as a black male, but in fact the 911

call did not make any mention of the perpetrator's race. *Id.* The CCRB investigator reported that

"[g]iven their inconsistent and contradictory testimony, the investigation did not credit the

officers' basis for suspecting [the individual] as the perpetrator of a robbery." *Id.*

The government argues that this incident is not probative of truthfulness because the

CCRB  "did not adopt the investigator's credibility determinations or make any adverse

credibility finding" against the officers. *Id.* at 9, 13. The government notes that according to

official procedures, the CCRB may "include a specific finding of a 'False Official Statement,'

either as an 'other misconduct' finding (prior to March 2020 CCRB-charter amendments) or as a

substantiated finding (subsequent to March 2020 CCRB-charter amendments)." *Id.* at 9 n.6. The

CCRB did not note a "false official statement" in the other misconduct section and thus, the

government argues, no adverse credibility finding was made.[3] *Id.* The government cites *United*

*States v. Teron*, 478 F. App'x 683, 685 (2d Cir. 2012), in which the Second Circuit affirmed the

---

[3] The government's characterization of a "false official statement" notation as a credibility
finding is somewhat misleading because the CCRB never makes any findings of a "false official
statement" according to its own rules. A finding of a false official statement is "outside of the
CCRB's jurisdiction," and the most the CCRB can do is flag a possible false official statement
for review by the NYPD. CCRB, *2014 Annual Report* 38,
*http://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/annual_bi-annual/2014_annual.pdf.*

district court's decision to preclude questioning regarding a substantiated CCRB allegation even though the investigator had deemed the officer's account "not credible." *Id.* In *Teron*, the Second Circuit found that because the CCRB had left the "other misconduct" section blank, "[t]here is no basis to infer that the CCRB adopted the investigator's statements regarding [the officer]'s credibility when it voted to substantiate the improper search." 478 F. App'x at 685.

However, although the Second Circuit found no abuse of discretion in *Teron*, I am not convinced that a district court is always required to ignore an investigator's determination of incredibility just because the "other misconduct" section does not flag a false official statement. For example, in *United States v. Barret*, 10-CR-809 (KAM), 2012 WL 194992, at \*3 (EDNY Jan. 23, 2012), the district court permitted a "limited cross-examination regarding the fact that CCRB investigators found incredible certain statements made by [the police officer] during the course of their investigations" into an allegation that was ultimately substantiated. In the CCRB case against Officers Cayenne and Sabella, the investigator clearly stated that "the investigation did not credit the officers' [accounts]." Gov't's Mot. 9. I do not find the government's distinction between this clear adverse credibility determination and the lack of an "other misconduct" notation to be a compelling one. *Cf. White*, 692 F.3d at 249 (rejecting the government's distinction between a district court judge finding that "certain aspects of [the witness's] testimony not credible" and an "explicit finding[] that the witness lied").

Here, the majority of the *Cedeño* factors weigh in favor of permitting the defense to inquire into the CCRB investigation on its cross-examination of Officers Cayenne and Sabella. The discredited statements occurred only two years ago, and since then Officer Cayenne has

been disciplined for another substantiated CCRB allegation[4] (fifth factor). The officers'

statements also pertained to the central issue of the investigation—whether or not an unjustified

stop had occurred—and concern matters that impact the public's trust and confidence in law

enforcement (fourth factor). *See Barret*, 2012 WL 194992, at *3 (finding that the fourth *Cedeño*

factor weighed in favor of allowing limited inquiry into a CCRB credibility finding because the

officer's statements involved "the public's trust in law enforcement officials"). And although the

statements were not made under oath in a judicial proceeding (third factor), a CCRB

investigation is "conducted under the auspices of an official process and [is] sufficiently

significant to have apprised [the officers] of [their] duty to respond truthfully." *Id.*

  I agree with the government that the first, second, and sixth factors weigh against cross-

examination. However, I do not place great weight on the first factor ("whether the prior judicial

finding addressed the witness's veracity in that specific case or generally"). *Cedeño*, at 83. In my

view, a finding that a witness lied in the course of an official procedure about a specific but

significant matter necessarily sheds light on that witness's more general character for

untruthfulness. As to the sixth factor, the apparent motive to lie during a CCRB investigation is

to avoid discipline and reputational damage, while the motive to lie during Mr. Jackson's trial

would be to secure his conviction. *See Barret*, 2012 WL 194992, at *3 (finding that the police

officer's motive to lie during a CCRB investigation was "to protect his personal and professional

interests from disciplinary action" while his motive to lie in the instant trial would be "to explain

the circumstances of the arrest of [the] defendant . . . and the recovery of a firearm").

---

[4] Without the underlying files for the subsequent substantiated allegation, I cannot determine whether it contained any credibility findings.

The government argues that seventh factor weighs against cross-examination because "the officers would all offer an explanation for the prior credibility finding, namely, that the finding was in error and that they had always told the truth." Gov't's Mot. 18. I disagree with this analysis. The seventh factor asks "whether the witness offered an explanation for the lie and, if so, whether the explanation was plausible." *Cedeño*, 644 F.3d at 83. There is no indication that the Second Circuit in *Cedeño* was directing district courts to consider hypothetical future explanations for the prior lie and to assess whether those explanations—which haven't been made yet—are plausible. As far as I can tell from the records before me, Officers Sabella and Cayenne did not provide an explanation for their contradictory statements, and Officer Cayenne did not explain why his statement contradicted the recording of the 911 call. Furthermore, the hypothetical explanations provided by the government—that the officers would maintain that they were telling the truth—does not offer any substantive reason to question the investigator's finding to the contrary.

Given my obligation to give defendant "wide latitude" to cross-examine government witnesses in a criminal case, *id.* at 82, I find that it would be unfair to preclude the defense from inquiring into a finding that is so highly probative of the officers' character for truthfulness. In the interest of "protect[ing] against . . . harassment, prejudice, confusion, and waste," *id.*, I find that the defense's inquiry must be limited to the credibility finding itself and must not inquire into the misconduct underlying the investigation.

B. The August 2011 Case Against Officer Feliciano

In August 2011, an individual working as a home health aide alleged that she had called 911 to report that she was being sexually harassed by one of her patients, and that when Officer Feliciano responded to her call, he stated, "He [the patient] just wanted a piece of island meat,"

and "He just wanted a piece of island meat to eat." Gov't's Mot. 11. Although Officer Feliciano

denied making this remark or discussing the complainant's ethnicity or nationality, the CCRB

substantiated the allegation, finding that the complainant's statements were credible and that

there was no evidence to substantiate Officer Feliciano's denial. *Id.* at 11–12.

The second, fifth, and sixth *Cedeño* factors weigh against allowing the defense to cross-

examine Officer Feliciano about this credibility finding. The two sets of testimony did not

involve similar subject matter, as the 2011 denial involved offensive remarks toward a victim

and the testimony in this case will involve Officer Feliciano's basis for arresting the defendant.

The 2011 testimony occurred almost a decade ago, and only one CCRB complaint has been

made against Officer Feliciano since, and that complaint was subsequently withdrawn. Officer

History, Ex. C, ECF No. 92-3. Finally, Officer Feliciano's apparent motive to lie during the

CCRB investigation was to avoid disciplinary action and reputational harm, whereas his motive

to lie in the present proceeding would be to help secure the conviction of Mr. Jackson.

As explained above, the first *Cedeño* factor weighs weakly against cross-examination, as

the CCRB did not explicitly make any findings against Officer Feliciano's veracity more

generally, as opposed to the veracity of his testimony in this specific case.

The remaining factors weigh in favor of allowing cross-examination. As discussed above,

although the lie was not made under oath in a judicial proceeding, a CCRB investigation still

entails a duty to tell the truth (third factor). As to the fourth factor, Officer Feliciano lied "about a

matter of significance" when he lied about facts at the heart of the investigation: whether he had

harassed the complainant with racist and sexist remarks. As to the seventh factor, there is no

indication that Officer Feliciano provided any explanation for the lie. The government's

assertion that Officer Feliciano would, if questioned, maintain that he was telling the truth does

not undermine the CCRB investigator's finding to the contrary, particularly given the investigator's clear rationale for endorsing the credibility of the complainant's testimony.

Overall, I find that the factors ultimately weigh in favor of allowing the defense to make a limited inquiry into the 2011 adverse credibility finding during its cross-examination of Officer Feliciano. The defense's questioning must be limited to the credibility finding alone and must not inquire into the conduct underlying the investigation.

C.  The April 2015 Case Against Sergeant Alexander

In April 2015, an individual alleged that a group of three officers improperly stopped his vehicle, and that Sergeant Alexander improperly frisked and questioned him, and searched his vehicle. CCRB Findings & Recommendation, Ex. H, ECF No. 92. The complainant also alleged that, during an encounter on the following day, the same officers refused to provide their names when asked. *Id.* Sergeant Alexander was interviewed about the stop-and-frisk incident on May 12, 2015, not long after the incidents occurred on April 1 and April 2, 2015, and denied having any recollection of any part of the incidents. Draft Tr. Interview of Officer Alexander, Ex. H, ECF No. 92. The other two officers also stated that they did not recall the incidents. CCRB Findings & Recommendation.

Relying on the documentary evidence, the CCRB found that Sergeant Alexander was one of the officers involved and substantiated the allegations that he had improperly stopped, frisked, questioned, and searched the vehicle of the complainant, and improperly refused to provide his name during their encounter on the following day. *Id.* In its findings, the CCRB stated that the complainant was the "only reliable witness" in the investigation. *Id.* The CCRB report did not explicitly state whether it found the officers unreliable because they were lying about their inability to remember. However, given the short amount of time that passed between the

10

incidents and the interviews, it is implausible that none of the three officers were able to recall any of the many details about which they were questioned by the investigator. I therefore find that the findings against Sergeant Alexander are probative of his character for untruthfulness.

The first two *Cedeño* factors weigh against allowing the defense to cross-examine Sergeant Alexander about the 2015 CCRB investigation. The investigation did not make any findings about Sergeant Alexander's general veracity, and the two sets of testimony did not involve similar subject matter because the 2015 complainant was released without any arrest or charges. The third factor weighs in favor of allowing cross-examination for the same reason discussed above in my analyses of the other CCRB cases. As to the fourth factor, Sergeant Alexander's statements involved matters of significance because improper stops, frisks, and searches diminish the public's confidence in the law enforcement. The fifth factor also weighs in favor of allowing cross-examination because, although the investigation occurred five years ago, another adverse credibility finding was made against Sergeant Alexander in 2018. *See infra* Section Three. As to the sixth factor, Sergeant Alexander's apparent motive for lying during the CCRB investigation was to avoid discipline and reputational damage, whereas his motive to lie in the present proceeding would be to secure a conviction of Mr. Jackson. Finally, as to the seventh factor, I do not find that Sergeant Alexander's explanation for his unreliability—his inability to recall a single aspect of the event—is plausible.

I conclude that the defense may raise this finding on cross-examination but must strictly limit its questioning to the fact that the investigation found Sergeant Alexander's account unreliable due to his inability to recall the incidents, and that the allegations were substantiated. The defense may not question Sergeant Alexander about the misconduct underlying the allegations.

### III.   *United States v. Kelvin Jones*

In 2018, Sergeant Alexander testified in a suppression hearing before Judge Irizarry, who

found "critical portions" of his testimony "incredible." *United States v. Jones*, No. 17-CR-103

(DLI), 2018 WL 1582217, at *1 (E.D.N.Y. Mar. 29, 2018). Sergeant Alexander was testifying

about his reasons for stopping, pursuing, and frisking the defendant, Kelvin Jones, who was

subsequently charged with possession with intent to distribute cocaine base, unlawful use

of a firearm, and being a felon in possession of ammunition. *Id.* 1–3. Sergeant Alexander

testified that he saw "a silver object sticking out of [Defendant's] waistband and he was pushing

it down into his pants." *Id.* at *4. He also testified that he observed the defendant shaking a

firearm down his pants leg as he was attempting to flee. *Id.* at *7.

Judge Irizarry discredited these statements. She noted that the defendant was "wearing a

large bubble jacket and bulky sweater, loosely lying over and outside his pants" on the night of

his arrest, which made it "difficult to fathom how any officer could have seen the outline of a

gun or a silver handle in the waistband through the clothes." *Id.* at *4. She also found it

suspicious that Sergeant Alexander failed to warn the other two officers that the defendant was

armed, which was "contrary to [his] purported own best practices." *Id.* at *5. Sergeant

Alexander's testimony was also inconsistent because he first testified that he directed another

officer to stop the car after seeing the silver object in the defendant's waistband, but later

testified that he formed the belief that the defendant was concealing a weapon after getting out of

the car. *Id.* Finally, Judge Irizarry found that Sergeant Alexander's testimony that he observed

the defendant shaking a firearm down his pants leg was contradicted by the fact that he searched

the defendant's jacket pockets first, finding crack cocaine, and only searched for a weapon after

the defendant stated that he was carrying a firearm. *Id.* at *7. Judge Irizarry ultimately concluded

that Sergeant Alexander's testimony, as well as the testimony of the other two officers, was "disturbingly largely incredible." *Id.* at \*3.

The Second Circuit has "long held that a witness can be cross-examined based on prior occasions when his testimony in other cases had been criticized by [a] court as unworthy of belief." *White*, 692 F.3d at 248 (citation and internal quotation marks omitted). The government, however, argues that I should preclude or at least "tightly limit" any inquiry into this adverse credibility finding on cross-examination. Gov't's Mot. 18. I do not find that the defense should be precluded from inquiring into Judge Irizarry's finding but agree that the scope of the cross-examination—as well as the scope of the government's redirect—should be limited.

The majority of the *Cedeño* factors weigh in favor of allowing cross-examination. The third and fourth factors, as conceded by the government, clearly favor allowing cross examination because Sergeant Alexander's incredible testimony was made under oath in a judicial proceeding and concerned a matter of significance. *Id.* at 19. I disagree with the government's analysis of the second factor, *id.* at 19 n.9, because both sets of testimony involve Sergeant Alexander's suspicion that the defendant possessed a weapon. I also disagree with the government regarding the sixth factor and find that the apparent motives to lie in both cases—to secure a conviction of the defendant—are similar. Finally, as to the seventh factor, it is unclear from the government's argument whether Sergeant Alexander has already stated that the credibility finding was a result of his lack of testifying experience and that "it is not necessarily a best practice to immediately inform other officers of any suspicion that an individual may have a gun," or if the government is hypothesizing as to what he would say if asked. Gov't's Mot. 19–20. Even if Sergeant Alexander did provide such an explanation, I do not find that it is strong enough to tip the scales in favor of precluding cross-examination.

The government argues that even if Judge Irizarry's prior finding is probative of truthfulness, it should still be precluded under Rule 403 because it would "open[] the possibility of a significant detour into whether the previous judge was correct in the previous case," leading to "prejudice, waste of time, and confusion." *Id.* at 20 (citation omitted). The government worries that simply limiting the scope of the inquiry would not solve the problem of introducing prejudice and confusion, because "a limited discussion of *Jones* would potentially leave the jury with the misimpression that Sergeant Alexander had been accused of planting evidence in that case." *Id.* at 21. Both of these concerns are unfounded. As the Second Circuit found in *White*, "the district court's fear that admitting the evidence would confuse the jury because it would require the attorneys to delve into the facts and history of the [prior] case is misplaced" because the court could have imposed "reasonable limits" on the scope of the inquiry. 692 F.3d at 251. The court could have allowed the defense to ask the witness simply "whether [he] previously gave testimony . . . under oath, in another federal gun possession case, and whether the judge in that case refused to credit six different aspects of [that] testimony." *Id.* (citation omitted). This line of questioning would have given the defendant "wide latitude" to cross-examine government witnesses, as required by *Cedeno*, 644 F.3d at 82, "while allaying the district court's fear that the evidence would invite . . . distraction and confusion of the jury." *White*, 692 F.3d at 251 (citation and internal quotation marks omitted). The same balance can be achieved in the present case by allowing the defense to inquire into whether a judge in a prior case refused to credit Sergeant Alexander's testimony. If both the defense and government are prohibited from delving into the underlying facts of that case, I see no reason why the jury would get the "misimpression that Sergeant Alexander had been accused of planting evidence" in *Jones*. Gov't's Mot. 21.

I also disagree with the government's suggestion that it would be appropriate to question "whether the previous judge was correct in the previous case." Gov't's Mot. 20 (citation omitted). Judge Irizarry's finding was well supported, and I see no reason to relitigate an issue that she already decided. In *United States v. White*, which reversed the district court's decision to preclude inquiry into a prior adverse credibility finding, the Second Circuit found that Judge Block had "unequivocally discredited [the witness's] testimony" in the prior case, and that the district court's speculation as to other possible explanations for the witness's inconsistent testimony was "insupportable." 692 F.3d 250–51. The district court "clearly erred" in excusing the witness's "discredited testimony by ascribing blameless reasons and explanations to it, without even a hint from [Judge Block] in support of such explanations." *Id.* at 251.

Nor do I find that it is necessary to inform the jury of the difference between a suppression hearing and a trial. Gov't Mot. 20. In both contexts, the relevant issue is whether the witness lied despite swearing to tell the truth. *See White*, 692 F.3d 235 (finding that Judge Block's prior adverse credibility finding was admissible at trial even though that prior finding was made during a suppression hearing).

Overall, I find that the substantial probative value of Judge Irizarry's finding outweighs the risk of prejudice, waste of time, and confusing or misleading the jury. In the interest of minimizing those risks as much as possible, I instruct the defense to limit its inquiry to the adverse credibility finding itself and refrain from questioning Sergeant Alexander about the facts of the underlying case. I similarly instruct the government to refrain from delving into the underlying facts in its redirect.

IV.    **My October 2020 Finding that Defendant Fabricated his Asthma Diagnosis in an Attempt to Mislead the Court**

15

On April 15, 2020, Mr. Jackson moved for his release from custody on the grounds that he suffered from asthma and would therefore be at greater risk of severe illness if he became infected with COVID-19. Def.'s Mot. Release, ECF No. 47. Although I had previously denied Mr. Jackson's earlier request for bail because of his significant criminal history, missed court appearances, parole violations, and violent crime of indictment, I granted his April 15 motion because "the COVID-19 crisis—and the heightened risk that it poses to Jackson as an asthma sufferer detained in a facility where the virus is present—is new information that has material bearing on whether any conditions of release will reasonably assure Jackson's appearance and the safety of the public." Apr. 17 Order 4, ECF No. 50. My decision to release Mr. Jackson "turned entirely" on his representation that he had asthma. Tr. Remand Order (Oct. 26, 2020). "If I had not been misled into thinking that he suffered from a high-risk condition, I would not have released him." *Id.*

In its preparation for trial, the government discovered evidence that Mr. Jackson had lied about having asthma and moved to revoke his bail. Gov't's Mot. Revoke Bail, ECF No. 69. The defense opposed the motion but did not counter the government's assertion that defendant did not, in fact, have asthma. Def.'s Resp., ECF No. 71. I granted the government's motion and remanded Mr. Jackson, finding that he had deliberately misled me about his asthma diagnosis in order to secure release from incarceration. Tr. Remand Order (Oct. 26, 2020).

Now the government seeks to raise this credibility finding in its cross-examination of Mr. Jackson, should he testify at trial. The defense opposes, arguing that my credibility finding is based on an inference because Mr. Jackson's motion for release relied on the fact that he was prescribed an inhaler as opposed to a representation by Mr. Jackson that he had asthma in an affidavit to the court. Def.'s Letter, ECF No. 100. I do not find that the lack of a direct statement

16

to the court by Mr. Jackson weakens the probative value of the credibility finding against him. My finding was supported by ample circumstantial evidence. It was not until after the COVID-19 crisis was underway that Mr. Jackson first indicated that he was a chronic asthma sufferer. Prior to March 2020, his medical records contain no mention of asthma, and in some instances, he even denied that he suffered from it. Gov't's Mot. Revoke Bail 6, ECF No. 69. Moreover, in a phone call he placed from MDC, he told his girlfriend that he had asthma when they were discussing how his attorney could try to get him released due to his health conditions. *Id.*, at 5. When she responded with amusement and disbelief that he had suddenly been afflicted with a chronic condition of which he had never shown any symptoms, he chastised her for being "slow" and "let[ting] the world know [he] was lying . . . on a jail phone." *Id.*, at 5–6.

In response to the government's motion, the defense argued that Mr. Jackson did not mean to mislead me because the only factual statement contained in his original motion for release was the true statement that he was prescribed an inhaler by the MDC medical staff. Def.'s Resp. 2. I rejected this attempt to recharacterize the defendant's untruthfulness, finding that "[d]efendant's acquisition of the inhaler clearly served the purpose of persuading me that he suffered from asthma, which was the basis for his motion for release." Tr. Remand Order (Oct. 26, 2020).

The majority of the *Cedeno* factors weigh in favor of allowing the government to inquire into this adverse credibility finding on cross-examination. Very little time has passed since the lie, which concerned a matter of significance, as it influenced my decision to release Mr. Jackson from custody despite his criminal history and missed court appearances. In both instances, the motive to lie is to avoid detention. Mr. Jackson did not provide an explanation for the lie, and in fact did not counter the government's assertion that he did not have asthma.

17

Therefore, I will allow the government to question Mr. Jackson about my finding that he misled the court.

## CONCLUSION

For the foregoing reasons, the defendant's motion to allow cross-examination of the government's witnesses regarding the *Giglio* materials is granted as to the four cases highlighted above and denied as to the rest of the *Giglio* material. The government's motion to allow cross-examination of Mr. Jackson regarding the finding that he misled the court in his motion for release from custody is also granted.

SO ORDERED.


Dated:  November 16, 2020
        Brooklyn, NY

                                                        _/s/_____
                                                        Allyne R. Ross
                                                        United States District Judge