

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS/NJM                              *271 Cadman Plaza East*
F. #2019R00984                       *Brooklyn, New York 11201*

February 23, 2022

By ECF

The Honorable Allyne R. Ross
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    United States v. Tyquan Jackson
>        Criminal Docket No. 19-356 (ARR)

Dear Judge Ross:

The government respectfully submits this letter in connection with the defendant's sentencing, currently scheduled for March 1, 2022 at 11:30 a.m.  The government respectfully submits that a United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") sentence of 120 months' imprisonment is appropriate in this case.

I.      Background

        A.      The Defendant's Background

As set forth in the Presentence Investigation Report (the "PSR"), the defendant is an admitted gang member with a long criminal history.  See PSR ¶¶ 32-35, 39; see also United States v. Jackson, No. 19-CR-356 (ARR), 2021 WL 62109, at *1 (E.D.N.Y. Jan. 7, 2021) (describing evidence of the defendant's gang membership).

The defendant's first criminal conviction arose from an arrest in June 2012, when the defendant was caught selling crack cocaine.  See PSR ¶ 32.  The defendant pleaded guilty to Criminal Possession of a Controlled Substance in the Seventh Degree, a misdemeanor, in September 2012 and was placed in a drug treatment court, which would have resulted in dismissal of the charges following his plea if the defendant complied with the terms of the program.  See GX504A (Sept. 24, 2012 Guilty Plea Tr.) at 405.

Approximately one month later, on October 26, 2012, the defendant was caught again selling crack in the same location where he had previously been arrested.  See

PSR ¶ 33.  When the police attempted to arrest him, the defendant resisted arrest by refusing to be handcuffed, flailing his arms and stiffening his wrists, all while cursing at the arresting officers.  See id.  Approximately three weeks later, on November 14, 2012, the defendant pleaded guilty to Criminal Sale of a Controlled Substance in the Fifth Degree, a felony, and was permitted to continue in the drug diversion program.  See GX506A (Nov. 14, 2012 Guilty Plea Tr.) at 5-8.

In January 2015, while still in the diversion program, the defendant sold crack to an undercover police officer.  See PSR ¶ 35.  He was not arrested at the time.  On May 10, 2015, however, the defendant was arrested after being found in possession of a loaded firearm and additional crack cocaine.  See PSR ¶ 34; see also Dec. 28, 2020 Tr. (DeLeon deposition testimony) at 29:5-31:4.  Another individual riding in the car with the defendant at the time of his arrest was also found to be carrying a loaded firearm.  See Dec. 28, 2020 Tr. at 40:11-41:12.  A ballistics analysis of the firearm seized from the defendant determined that that firearm has been used in a 2014 non-fatal shooting.  See TJ003961 (lab report).[1]  In August 2020, the defendant was arrested for his January 2015 drug sale.  See PSR ¶ 35.

On January 15, 2016, the defendant was sentenced to one year's imprisonment for his misdemeanor drug conviction and two year's imprisonment for his felony drug conviction, with both sentences running concurrently.  See PSR ¶¶ 32-33.  On February 1, 2016, the defendant pleaded guilty to Criminal Sale of a Controlled Substance in the Third Degree, a felony, in connection with his January 2015 drug sale.  See GX501A (certificate of disposition).  On March 9, 2016, he was sentenced to 1 year's imprisonment, to run concurrently with his prior sentence.  See PSR ¶ 35; see also GX501A.

On June 15, 2016, the defendant pleaded guilty to Criminal Possession of a Weapon in the Second Degree and Criminal Possession of a Controlled Substance in the Fifth Degree, both felonies, in connection with his May 2015 arrest.  See GX502A (certificate of disposition).  On July 5, 2016, the defendant was sentenced to 42 months' imprisonment on the weapons charge and 18 months' imprisonment on the drug charge, both to run concurrently to his prior convictions.  See PSR ¶ 34; see also GX502A.

Thus, for all of the above criminal conduct, the defendant was sentenced to a total of 42 months' imprisonment.  While serving that combined sentence, the defendant repeatedly violated the rules of his prison, including by smuggling drugs into the prison.  See PSR ¶ 34.  He was released to parole on May 31, 2018.  See id.

As detailed in pretrial motions, despite his parole supervision, the defendant almost immediately returned to criminal conduct, including drug dealing, fraud and identity theft.  See ECF Dkt. Nos. 167, 169-170, 185; see also PSR ¶ 39.  The defendant was arrested

---

[1]      To the government's knowledge, the defendant is not a suspect in that shooting.

in February 2019 in connection with larceny charges relating to his fraudulent conduct, although these charges were subsequently sealed.

B.    The Instant Offense

As proven at trial, on July 6, 2019, while still on parole for his prior offenses and on bail for his February 2019 arrest, the defendant was walking in the East Flatbush neighborhood of Brooklyn, New York, at approximately 9:30 p.m. — after his curfew — carrying a loaded handgun.  See PSR ¶¶ 7-8, 15.  When officers noticed him acting nervously and gripping a bulge in his pocket, they identified themselves as police and told him to stop. See PSR ¶¶ 8-11.  Instead of stopping, the defendant ran, and the officers pursued him in their car.  See PSR ¶ 11.  The defendant repeatedly tried to evade the officers by running back and forth on the street, and two of the officers eventually got out of the car to chase him on foot.  See PSR ¶ 12.

While running, the defendant took the firearm — which was loaded, with a cartridge in the chamber — out of his pocket and threw it towards the houses on the street. See PSR ¶ 13.  In landed in the front yard of an elderly widow.  Moments later, the defendant was subdued by the police.  See PSR ¶ 14.  The defendant claimed to the police that he knew they were officers and had run because he was on parole for drugs.  See PSR ¶ 16.  The officers eventually found the firearm the defendant had thrown and placed him under arrest. See PSR ¶ 15.

While being processed at the police station following his arrest, the defendant refused to provide his name or pedigree information, accused the arresting officers of racial profiling, refused to be placed in a holding cell with other arrestees, refused to remove his belt and shoelaces as required by police protocol, and accused the officers processing him of assaulting him and sexually harassing him.  See GX303 (bodyworn camera video) at 1:40-8:10.

C.    The Parole Hearing

On July 19, 2019, the defendant appeared for a parole hearing relating to his alleged violations of parole, including the violation of his curfew.  At the hearing, the defendant testified that he had been stopped by the police before his 9:00 p.m. curfew.  See GX509A (July 19, 2019 Parole Tr.) at 25-26.  Specifically, the defendant claimed that he had left his mother's home at 8:35 p.m. or 8:40 p.m. to walk to his own home, that he was stopped fifteen to twenty minutes later, and that he would have been home by approximately 9:05 p.m. had he not been stopped.  See id.  In fact, the defendant was arrested at approximately 9:30 p.m., at a location a 35-minute walk from his mother's home in Canarsie, Brooklyn, and over an hour walk from his then-residence in Sunset Park, Brooklyn.

The defendant further testified that he ran from the police because they were chasing him and he did not know they were police officers, that he did not hear the officers identify themselves as police officers and that all he heard was the officers yelling, "[S]hoot him, shoot him."  GX509A at 26:22-27:7.

3

D.     Pre-Trial Proceedings

The defendant was arrested on federal charges on July 24, 2019 and appeared
for a detention hearing that same day.  The Honorable Peggy Kuo ordered the defendant
released on a $50,000 bond secured by four sureties, including several members of his
family.  ECF Dkt. No. 5.  One day after the defendant was released on federal bail, he was
re-arrested by state authorities to be held for his parole violation proceedings.

While in state custody, the defendant refused to appear for federal court
appearances on at least three occasions, in violation of the terms of his federal bail.  The
Court ultimately revoked the defendant's bail and stated on the record that it would issue a
force order if the defendant failed to appear again.  See ECF Dkt. No. 23.

On March 9, 2020, the defendant moved to suppress the firearm found by the
police and his post-arrest statements to the police.  See ECF Dkt. No. 43.  In support of his
motion, the defendant included a sworn affidavit, which as described in greater detail below,
contained numerous false statements.  See ECF Dkt. No. 43-2 ("Def. Aff.").  The Court
denied the motion on April 10, 2020.  See ECF Dkt. No. 46.

On April 15, 2020, the defendant moved for bail, arguing that release was
appropriate in light of the risks posed to him from COVID-19.  See ECF Dkt. No. 47.  The
defendant claimed that he was "particularly at risk for grave health complications should he
contract COVID-19" because he was "asthmatic."  Id. at 1.  The Court granted the defendant
bail, relying primarily on his assertion that he had asthma and was therefore at greater risk.
See United States v. Jackson, No. 19-CR-356 (ARR), 2020 WL 1905674 (E.D.N.Y. Apr. 17,
2020).  The government and the Court eventually learned that the defendant had fabricated
his asthma diagnosis in order to mislead the Court, and the Court revoked the defendant's
bail on October 26, 2020.  See ECF Dkt. Nos. 68-69, 73; Oct. 26, 2020 Tr.

The defendant moved for bail again in February 2021, which the Court denied.
See United States v. Jackson, No. 19-CR-356 (ARR), 2021 WL 753307 (E.D.N.Y. Feb. 26,
2021).

E.     Prison Infractions

On March 2, 2020, the defendant was captured on surveillance video
participating in a group assault in the MDC.  Specifically, the defendant and another inmate
went into another inmate's cell and began to punch and kick him.  The defendant was placed
in the SHU following this incident, but he was released on bail before a disciplinary hearing
could be held.

On March 2, 2021, the defendant evaded a routine patdown and destroyed
evidence.  PSR ¶ 51; GX1000.  According to MDC records, when a guard directed the
defendant "to place his left had on the wall[, the] inmate refused and starting running towards
the bottom tier," leading the guard to chase and to "radio[] for additional staff to report."
GX1000.  In the bottom tier, the defendant "continued to run back up the stairs towards the

shower area," then ran "inside Shower#1 and disposed [of] unknown items down the shower drain."  Id.  He was sanctioned to loss of 41 days' good conduct time and 15 days of disciplinary segregation.  PSR ¶ 51.

      F.     The Trial

      The defendant proceeded to trial on May 28, 2021, where his primary defense was to accuse the testifying officers of perjuring themselves to frame him.  See Trial Tr. 347:11-12 (arguing in defense summation that "[t]his is made up, ladies and gentleman.  This is made up."); id. at 352:12-13 (arguing that officers did not activate their bodyworn cameras because "[t]hey didn't want people to see what they were doing"); id. at 357:7-8 (arguing that "when the officer turned his camera on to say, here's the gun, that's staged.  Right?  That's not real.").  The jury rejected that argument and unanimously convicted the defendant of possessing a firearm as a convicted felon on July 6, 2019.  See ECF Dkt. No. 11.

II.     Sentencing Guidelines

      As set forth in the PSR, the Guidelines Offense Level calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level (§ 2K2.1(a)(2)) | | 20 |
| Plus:    The firearm had an altered serial number (§ 2K2.1(b)(4)(B)) | | +4 |
| Plus:    Obstruction of justice (§ 3C1.1) | | +2 |
| Total: | | 26 |

See PSR ¶¶ 22-30.  Based on the defendant's Criminal History Category of V (see PSR ¶¶ 32-38), the defendant's Guidelines range of imprisonment is 110 to 137 months (see PSR ¶ 70).  Because the statutory maximum for the offense of conviction is ten years, the effective Guidelines range is 110 to 120 months.  See id.

      The defendant objects to the enhancements for the altered serial number and for obstruction of justice.  For the reasons set forth below, both objections lack merit.[2]

      A.    The Firearm's Serial Number Is Altered

      A serial number is considered "altered" when the entire number or a character of it is rendered "illegible" to the "naked eye."  United States v. St. Hilaire, 960 F.3d 61, 66 (2d Cir. 2020).  The serial number on the firearm possessed by the defendant satisfies that

---

[2]     Although not binding on the defendant, the government advised the defendant prior to trial that it estimated his Guidelines range after trial "would be just about ten years," and the defendant chose to proceed to trial with that understanding.  See ECF Dkt. No. 223-1 at 2:17-3:6.

test.  Here, all of the individuals who viewed the firearm with a naked eye read the firearm's serial number as 826521 — as documented in the original voucher, the Evidence Collection Team report, the NYPD Laboratory report, and the nexus expert's reports.  A close-up photograph of the firearm, however, reveals that an initial digit of the serial number — a 1 — had been defaced and that the firearm's true serial number was 1826521.  This alteration is visible upon a close examination of Government Exhibit 1C (attached to the defendant's sentencing submission as Exhibit A), as shown below.



The defendant argues that the defaced 1 is not actually a part of the serial number but, rather, just a "vertical line" and "one of many scratches on the weapon."  See ECF Dkt. No. 228 ("Def. Mem.") at 4.  In support of this claim, the defendant relies only on the testimony of Special Agent Howard Stern, who examined the firearm with his naked eye and who did not testify to any expertise in identifying altered serial numbers.  See id.  But zooming in on the defaced 1 at the beginning of the serial number and comparing it to the unaltered 1 at the end of the serial number shows clearly that the defaced 1 is neither a "vertical line" not a "scratch."  As shown below, the defaced 1 has the same serifs as the

unaltered 1 — the diagonal line at the top of the numeral and the horizontal line at the bottom of the numeral — all in the same proportions.[3]

**Defaced Initial Digit**                              **Unaltered Final Digit**

                                    

      Moreover, the area around the altered digit bears tell-tale signs of having been defaced. As shown in the zoomed-in image below, the area around the first half of the serial number is lighter and glossier than other parts of the firearm, the result of that portion of the metal having been filed or sanded down. The scratches on the metal are not random, as would be expected from normal wear, but run horizontally across the serial number and up-and-down its digits, the result of a purposeful effort to scratch those numbers off. And the pocking in the metal near the initial 1 and 8 of the serial number suggests an attempt to chemically remove that portion of the serial number. These all weigh in favor of a finding that someone attempted to remove the serial number but stopped after removing only the initial 1.

---

[3]     The defendant's argument undermines any potential claim that the firearm is not altered because the 1 is legible with the naked eye and the serial number is therefore wholly legible. As noted above, every witness who examined the firearm with the naked eye did not notice that digit, and even now the defendant argues that the digit is too unclear to support a finding that the true serial number is 1826521.



To the extent the Court is unable to determine that the serial number is altered based on the photograph alone, the government can request an expert analysis of the firearm, which would apply more advanced tools to determine whether the serial number has been altered. The government would have requested such an analysis earlier, but it did not appear that such an analysis was required because the defendant did not object to the PSR within the 14 days required by Fed. R. Crim. P. 32. See Fed. R. Crim. P. 32(f)(1) ("Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report."). Indeed, that failure to comply with Rule 32 is, standing alone, a sufficient grounds to overrule the objection and treat the PSR's Guidelines calculations as undisputed. See United States v. Tighe, No. 15-CR-62, 2018 WL 1307949, at *6 (E.D.N.Y. Mar. 13, 2018) ("[C]ourts have . . . refused to consider untimely objections to a PSR before sentencing.").[4]

---

[4]       See also United States v. Lindsey, 827 F.3d 733, 738 (8th Cir. 2016) ("We have explicitly held that the conjunction of Federal Rules 32(f)(1) and 32(i)(3)(A) establish that an untimely objection to a fact in the presentence report does not change the fact's 'undisputed' status, and the district court may adopt the fact without requiring any additional evidence." (internal quotation marks omitted)); United States v. Aguilar-Ibarra, 740 F.3d 587, 591 (11th Cir. 2014) ("The district court did not err in overruling Aguilar-Ibarra's objection to [Guidelines enhancement in PSR] as untimely. For that reason, we treat the matter as if no objection had been made."); United States v. Atkins, 513 F. App'x 577, 581 (6th Cir. 2013) ("To the extent that the [sentencing] memo raised additional objections to the presentence report, it was untimely and the district court was right to disregard it."); United

Accordingly, the Court should either overrule the defendant's objection and apply the enhancement for the altered serial number or grant the government time to request an expert analysis of the firearm to provide additional evidence of the serial number's alteration.

B.    The Defendant Attempted to Obstruct Justice

Pursuant to application note 4(B) to U.S.S.G. § 3C1.1, an enhancement for obstruction of justice is appropriate where a defendant commits "perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction." In order to apply the enhancement for perjury, a district court must "make findings to support all the elements of a perjury violation in the specific case, namely, that the defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Rosario, 988 F.3d 630, 633 (2d Cir. 2021). "It is preferable for a district court to address each element of the alleged perjury in a separate and clear finding, although the court can also satisfy these requirements by finding an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." Id.

Here, the defendant committed perjury both during his parole hearing and in his affidavit submitted to the Court in connection with his motion to suppress. At the parole hearing, the defendant insisted that he had been arrested before his 9:00 p.m. curfew and was only a few minutes from his home. See GX509A at 25-26. This claim was contradicted by his motion affidavit, where the defendant claimed that he was arrested at approximately 9:30 p.m. (see Def. Aff. ¶ 1) and by trial testimony. In both his parole testimony and his motion affidavit, the defendant claimed that he had not heard the officers announce themselves as the police, claims that were contradicted by the trial evidence. See GX509A at 26-27; Def. Aff. ¶ 7. In his motion affidavit, the defendant further claimed that he "was not holding anything in [his] pants pocket as [he] was walking," and that "the only items in his possession that may have created a visible bulge in [his] pants pockets were two smart phones and a cell phone charger," which was also contradicted by trial testimony and the jury's verdict. See Def. Aff. ¶ 6.

In his objections to this enhancement, the defendant does not dispute that these statements are false or that the defendant acted willfully and intentionally in making them. See Def. Mem. 2-3. Instead, the defendant claims that they were mere "denials of guilt" that should not be penalized. Id. at 2. But the application notes to U.S.S.G. § 3C1.1 state that denials of guilt under oath are different from unsworn denials of guilt and are worthy of

_____

States v. Ashley, 490 F. App'x 512, 514 (4th Cir. 2012) (district court did not err in refusing to permit untimely PSR objections absent showing of good cause); United States v. Morales-Aponte, 229 F. App'x 69, 72-73 (3d Cir. 2007) ("A District Court may rely on a factual statement in a PSR at sentencing, absent a timely and substantial objection from one of the parties."; " District Court was entitled to rely on the PSR without additional inquiry" where untimely objections were made at sentencing).

enhanced punishment.  See U.S.S.G. § 3C1.1 application note 2 (enhancement does not apply to "defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury)" (emphasis added)); id. application note 4(B) (enhancement is appropriate for perjury).  The defendant concedes that both his parole testimony and warrant affidavit were under oath.  See Def. Mem. 2; see also GX509A at 2:6-14 (defendant being placed under oath at parole hearing); Def. Aff. (stating that the affidavit was sworn "under penalties of perjury, pursuant to Title 18 U.S.C. § 1746").  This objection should therefore be rejected.

The defendant further asserts that his false statements were immaterial.  But his lies about the time of his arrest were highly material to his parole hearing, which focused in part on whether he had violated his 9:00 p.m. curfew, as were his claims that he had not knowingly fled from the police in violation of his parole.  The defendant's false statements in his motion affidavit were also material to his suppression motion.  While the defendant is correct that his motion to suppress the firearm was denied as a matter of law (see Def. Mem. 3), his suppression motion also included a motion to suppress his post-arrest statements.  See ECF Dkt. No 43.  Although the government mooted that part of the motion by not seeking to admit the defendant's post-arrest statements in its case-in-chief, the defendant's false claims would have been material to that issue.  Specifically, had the government opposed that aspect of the motion, the government would have had to establish that the officers had reasonable suspicion to stop the defendant.  His claims that he did not hear the officers announce themselves as police and that he did not have a firearm or a visible bulge in his pocket would have been material to that issue, as it would have contradicted the officers' basis for reasonable suspicion.  Indeed, if the defendant did not believe that his false statements could influence the proceedings, he would have had no reason to make them, especially in a filing prepared by counsel that "did not set forth all of the facts of which [the defendant was] aware."  Def. Aff. ¶ 8.

The government notes that while the above conduct is the most obvious basis for an enhancement under the Guidelines, it is merely a part of the defendant's pattern of dishonesty and obstruction in this case.  The defendant falsely accused the officers of misconduct at the time of his arrest (see GX303) and lied to the Court to obtain bail in 2020.  The defendant also attempted to conceal evidence by removing his Facebook account from public view after the government disclosed that it had learned of the account (but not before the government preserved evidence of the defendant's gang affiliation).  See ECF Dkt. No. 108 at 1-4.  Notably, while the account remained private through trial, it is once again publicly viewable at https://www.facebook.com/bosstony293.

The defendant's objection to the application of U.S.S.G. § 3C1.1 should therefore be overruled and the enhancement should be applied.

## III.   Argument

The government respectfully submits that a sentence of 120 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.  Such a sentence would fall approximately in the middle of the

defendant's Guidelines range but for the statutory maximum and is within the defendant's effective Guidelines range.

A 120-month sentence takes into account the defendant's gang membership and lengthy criminal history — including his prior conviction for firearms possession — and the seriousness of his offense. Unlawful firearms possession, and especially firearms possession by recidivist felons, poses a serious threat to the community and to law enforcement. Although it is not possible to know exactly why the defendant was carrying a loaded firearm that night (with a bullet in the chamber, ready to fire in an instant), there is no possible legitimate explanation or justification. Especially in a time of skyrocketing gun violence, a serious sentence is necessary to deter others from engaging in similar conduct and to deter the defendant, who apparently was not adequately deterred by his prior convictions, from further crimes.

A 120-month sentence would also appropriately reflect the defendant's conduct throughout this case. From his first interaction with the police, the defendant escalated the situation, potentially putting himself, the officers, and bystanders at risk, by running with a firearm and then throwing a loaded firearm into an elderly widow's front yard. Following his initial release on bail, the defendant repeatedly refused to come to Court, resulting in his bail being revoked. To avoid responsibility for his crime, the defendant filed a motion to suppress with an affidavit containing knowingly false statements. The defendant cynically took advantage of the coronavirus pandemic to obtain bail again, falsely claiming to the Court that he had asthma. During the time he was in jail, the defendant continued to engage in misconduct, including assaulting another inmate and destroying evidence during a search. And the defendant refused to accept responsibility to the very end, arguing at trial that the officers — who the evidence shows acted bravely and appropriately — were liars trying to frame an innocent man. Far from a peaceful man ready to live a productive life, the defendant's repeated efforts to dismiss, downplay and deny his criminal conduct bespeak a defendant who has "not accepted full responsibility for his actions and [is] likely to recidivate." United States v. Jimenez, 552 F. App'x 51, 54 (2d Cir. 2014).

A sentence of 120 months is also appropriate to avoid unwarranted sentencing disparities with others convicted of similar conduct. According to data from the United States Sentencing Commission, in cases such as this one, involving U.S.S.G. § 2K2.1, a Guidelines offense level of 26 and a criminal history category of V, from 2016-2020, 100% percent of defendants received a sentence of imprisonment, with an average sentence for imprisoned defendants of 108 months and a median sentence for imprisoned defendants of 110 months. See Judiciary Sentencing Information (JSIN), United States Sentencing Commission, https://jsin.ussc.gov. There is no basis here to treat the defendant less seriously than the median defendant, and given his conduct, a sentence above the median is justified.

The defendant argues that a reduced sentence is appropriate in light of the conditions in jail during the pandemic. See Def. Mem. 3-4. This argument unsurprisingly ignores that the defendant was not in jail for the worst period of the pandemic because of his successful lies to the Court about having asthma. Further, even if the sixteen months the

defendant was incarcerated during the pandemic were double counted for purposes of punishment, as the defendant proposes (see Def. Mem. 3-4), a 120-month sentence would be equivalent to a 136-month sentence, which would still be within the Guidelines range but for the statutory maximum.  The conditions of confinement during the pandemic should therefore be given minimal weight in determining the defendant's sentence.

The defendant further argues that separation from his family will deter the defendant from any further crimes, even with a below Guidelines sentence.  See Def. Mem. 4.  While the government does not doubt the defendant's family's love for him, or his love for them, this argument unfortunately rings hollow.  Neither the love nor support of the defendant's family prevented him from committing his numerous prior felonies or from promptly reoffending after his last substantial jail sentence.  Similarly, his family's status as sureties in this case did not prevent him from violating his bail by refusing to come to court. There is no reason to believe that this time will be any different.  The defendant's relationship with his family therefore does not warrant a reduced sentence.

Accordingly, the sentencing factors set forth in Title 18, United States Code, Section 3553(a), weigh in favor of a sentence of 120 months.  Such a sentence accurately balances the seriousness of the defendant's offense and other misconduct, will serve to deter other individuals from similarly engaging in such conduct, and avoids unwarranted sentencing disparities.  See 18 U.S.C. § 3553(a)(2)(A)-(B), (6).

IV.    Conclusion

For the foregoing reasons, the government respectfully submits that a sentence of 120 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/_____
Jonathan Siegel
Nicholas J. Moscow
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (ARR) (by ECF)
James Koenig, Esq. (by ECF and Email)
Heather Stepanek, Esq. (by ECF and Email)
Roberta Houlton, United States Probation Officer (by Email)